O’Neall, J.
[after making the foregoing statement of facts.] The questions arising out of these facts, seem to me to be the following, viz:
1. Ought Robert Brailsford to be charged as guardian with the income derived from the estate of Thos. N. Johnson, (which was assigned to him as his part of the estate of his father, from the time of his appontment'as guardian ?
2. Ought he to be charged as guardian, with the income of Mary Johnson’s estate from 1819.
*9841 *3. Is the parol discharge of Robert Brailsford by his ward, -I just after he attained to maturity without an account, a sufficient discharge in law to bar the account now claimed ?
4. Is Alex. W. Garden, the security of Robert Brailsford, the guardian, liable to the extent of the penalty of his bond, for the arrears of the said Robert on account of his said guardianship ?
5 Is Alex. W. Garden liable as executor of Mary Johnson, to account to the plaintiffs for the $1000 with interest thereon, paid to Robert Brailsford, on account of the legacy to his son ?
*221 6. Is Alex. W. Garden, as executor, accountable for the amount of the sale of the perishable articles sold as Mary Johnson’s estate, with the interest thereon ?
7. Was waste committed by Alex. W. Garden, and if so, are the plaintiffs entitled to an account for the same ?
8. Are the defendants in this case liable to account for the rent and hire directed to be accounted for in the former decree ?
Each of these questions have been most elaborately discussed, and have been maturely considered by the Court. The able and zealous counsel for the defendants has made us feel deeply for the orphan, who, from his statement, will be stripped of every thing by our decision : but it is not for us to give way to the feelings of men — our duty is a stern and inexorable one, to administer the law, which, as the Chancellor said in this cause, is justice. The several questions will, as briefly as possible, be disposed of in the order in which they have been set down.
1. There can be no question that the guardian, Robert Brailsford, is alone accountable for the income of that part of the estate of Thomas N. Johnson the younger, derived from his father; for as guardian, he seems by his own return to have been in the possession of the corpus of the estate: but in law, after the division between Thos. N. Johnson, and Sarah, and after a guardian had been appointed for the minor or minors, the executors were no longer accountable for the future income of the estate. The guardian was alone entitled to the possession of his ward’s estate, and must, as a matter of course, be regarded as in the receipt of the income. If Dr. Johnson received a part of the income, it must have been as the agent of the guardian : for he had no other right to receive it. It is probable that when the accounts of the receipts and expenditures of the guardian, and of Dr. Johnson, regarded as his agent in this respect, come to be examined, that all the supposed *hardships of r^ooc this part of the case will vanish. But be that however as it may, L Brailsford must account for the income of the estate, and show how it has been expended, and must be held responsible for any balance which may be found on the foot of his account.
2. There is perhaps a little more difficulty in the question, as to his liability to account as guardian for the income of Mary Johnson’s estate. He, Dr. Johnson, and Garden, were the executors of her will. Garden acted, as appears from the papers, for only a single year. The plantation and negroes were in the immediate vicinity of Brailsford ; and it .seems to be pretty well established from the defendants’ own showing, that he had the entire management of all Thos. N. Johnson’s estates, whether derived from his father or mother, which were in the country. These facts constitute such a reasonable showing, as would charge Brailsford with an account for the income, as executor, or as guardian. He mnst, however, by operation of law, account in the latter character ; for whatever funds he had in his hands as executor for Thos. N. Johnson, by operation of law, were transferred to his account as guardian. In addition to the view which I have suggested, it may be added, that executors are only jointly liable, so far as they concur in an act done in the administration of their testator’s estates. Each are primarily regarded as separately, liable : and as between themselves, this is always the rule. — Motte v. Shult and Motte, 1 Hill’s Ch. Rep. 146. It will be *222 observed, that Dr. Garden has accounted for his receipts of the income during the single year, in which he acted as executor. Dr. Johnson, in this case has filed his account, which is satisfactory to the parties. Mr. Brailsford has never exhibited any account of his receipts, unless it may be embraced in the account from 1818 to 1824, found among the papers furnished to me. The fair presumption from these circumstances is, that he is alone accountable for that part of the income unaccounted for. It is plain, that the income exceeds the sum received by the other executors. It is conceded that in this respect they have fairly accounted : the balance unaccounted for, may be fairly charged to him who, by his default in not accounting, is legally presumed to be in the wrong. Add to these considerations the fact, that as guardian, he ought by law, at the expiration of one year after his testator’s death, to have compelled the possession of *28fT^s war^’s estate to have been *delivered to him, and his liability -* to the account is sufficiently made out.
3. I am perfectly satisfied that the verbal discharge cannot operate. The only mode in which it could have effect, would be as an admission that an account had taken place between the guardian and the ward, and that the former had paid to the latter the balance due. But nothing of this kind did take place ; the guardian, Brailsford, as appears in this cause, had not made out his accounts until after the death of Thos. N. Johnson. He did not even pretend at the time spoken of by Mrs. M’Leod, the witness, to make any statement of the accounts of his guardianship with his ward. “ He,” (Mr. Brailsford) said “ he did not care much about it, (the discharge) as he had delivered up all the property, and did not have any money concerns with the estate, — that part was conducted by his co-guardian, Dr. Joseph Johnson, who would have to account for the funds.” This testimony of the witness puts the discharge out of all question ; for it shows that there was not only no accounting, but also that the guardian had deceived the ward in inducing him to believe that he had no funds belonging to him in his hands..
But, if a regular release had been executed, it could not have been supported. A guardian dealing with his ward, just after he has arrived at full age, and obtaining any beneficial contract from him, or a release of the ward’s rights, must, in order to have it sustained, show its fairness. In this case, the supposed discharge was probably in less than a year after the ward attained to full age, and at or about the time that he received the possession of his estate : and there is not only no proof of fairness in the transaction, but there is abundant reason to believe, that whatever Mr. Johnson did say, was said in ignorance of his rights. The ease of Hylton v. Hylton, 2 Ves. Sen. 541, is a clear and direct authority against the allowance of the release to the guardian, even if it had been regularly executed.
In that case, “ The plaintiff had considerable gifts or provisions left to him by the will of Philippa Downs, his aunt and Charles Palmer, his half brother. The defendant, his uncle, was acting executor and trustee in both those wills, and also acted as guardian to him during the minority, having neither father or mother. Coming of age in April, 1T46, he, in October, HIS, entered into a transaction with his uncle, whereby he granted to him an annuity *of £60,.gave him a general release, ■1 and two written discharges, all signed the same date with the grant upon his delivering up several papers ” “ The bill was filed to set *223 aside the grant of the annuity upon the general principles of being made just after coming of age without being thoroughly informed,” and Lord Chancellor Hardwicke decreed accordingly. In the conclusion of his opinion, the Lord Chancellor says, “ nor is there any evidence of an account made up of the personal estate proved to have come to the defendant’s hands. Certainly, if any thing could make such a transaction supportable, it must be where there was a real and fair account; of which there is no evidence : yet a general release is given upon delivering up several papers and vouchers as they are called.”
It will be observed that the Chancellor says in that case, that the only circumstance which could sustain the grant of the annuity, was “a real and fair account; the same rule governs a release, which is in point of fact a gift to the guardian of his arrears; and unless the ward sees most clearly what he is about to do, it cannot be supported. In the case under consideration, that knowledge is wanting, and in every point of view, the defence attempted to be set up in this respect must fail.
4. That the security of the guardian is liable for the default of his principal to the full amount of the penalty of the bond, is, I think, too plain a proposition to require much illustration. The appointment of a guardian of the person and estate of a minor, is not, as was supposed by my friend, the counsel for the defendants, limited to the property set out in the petition, praying that the appointment should be made. The Court may, it is true, so limit it; but unless the appointment is restricted and special in its terms, it extends to all the property which the minor may then or afterwards possess. It is hence that the bond is always taken in a larger sum than the nett value of the ward’s estate at the time the appointment is made. There might have been some difficulty about the jurisdiction of the Court, to decree against the security: but, as in the case of M’Dowall v. Caldwell, 2 M’C. C. R. 43, that question was not raised by the defendants, and the Court will at once, without any circuity of action, hold the representatives of Dr. Garden liable, so far as they may have assets, real or personal, and to the extent of the penalty of the bond, for the default of the guardian, Robert Brailsford.
5. Ithink that Alex. W. Gardenis liableas executorto the *plain- pggs tiffs’ intestate for the §1000 and interest thereon, paid by him to L Robert Brailsford for his son’s legacy. The truth of this conclusion depends upon showing that this payment was an illegal one, and that the payment made by Dr. Joseph Johnson, the surviving executor, out of the residuary estate, was proper, and entitles the plaintiffs’ intestate to the account against Garden, the executor. It was contended that the payment to Robert Brailsford, as the father of the legatees, was good. But this is wholly untenable. The point was very fully considered and adjudged by Chancellor Kent, in the case of Genet v. Tallmadge, 1 John. C. R. 3. He held, after a general review of the decided cases, that a father, as such, had no right to receive the legacy of his child. To attempt to add any thing to his conclusive array of authorities, would be an idle consumption of time. It was next urged, that although the payment to him, as father, might not be good, yet, that as co-executor, he had the right to receive the legacy, and that his receipt of the money discharged Garden. I have already had occasion to say, that primarily executors are regarded as separately liable; but that, if they concur in any act *224 touching their testator’s estate, that they are jointly liable. This is, I think, a wise rule in both its parts — the latter is only subject to objection on the present occasion, and it is only necessary that it should now be vindicated. If it were the case that executors when they concurred in an act were not required to account for it jointly, there could be no safety to an estate. Besponsibility might be shifted at pleasure by transferring the funds : and a solvent executor might release himself from liability, by simply producing the receipt of an insolvent co-executor. For the sake of some pecuniary advantage or other cause, an executor might desire to give up his trust; it has been held that the Courts cannot release him ; and yet, by simply turning over the funds to his co-executor, he might be released, if his liability ceased as soon as he parted with them to his co-executor. If he choses to turn over a fund in his hands to his co-executor, he is generally responsible for its administration; for he thus makes the other his agent for its application. Both are liable to their cestui que trusts, for both have had the actual control of the fund, and both have concurred that one should manage it. If it is a well settled rule of law, “ that where by an act done by one executor, any part of the estate comes to the hands of his co-executor, the former will be answerable for the latter, in the same manner as he would have *been for J a stranger whom he enabled to receive.” Toller’s Law of Ex’ors, 484. It is our duty to give it effect in this case, by holding Garden to be liable for the $1000 paid to Brailsford for his son’s legacy and by him not paid over. Without going through all the cases bearing upon this position, it will be sufficient to cite and examine some of the leading cases. In Oróse v. Smith and Munt, Y East. 246, the defendants were co-executors of Grierson, who was indebted by bond to the plaintiffs’ intestate. Smith having £400 of the assets of his testator, remitted the same to Munt, for the purpose of being paid over to the payment of Grierson’s debt; he however paid it to a simple contract debt due by Grierson to himself, and subsequently became bankrupt. The question was, whether Smith was liable for the misapplication of the £400, and it was held that he was. The only possible distinction between that case and the one under consideration is, that there the question was made by a creditor plaintiff, and here by the residuary legatee. I am persuaded from the best examination I have been able to give to the subject, there is no such just distinction; but that will be further considered in the sequel. In the ease of Crosse v. Smith, Lord Ellenborough’s concluding words state very fully and forcibly the legal conclusion, malting out almost in terms the rule which I have stated from Toller. He said, “ in conformity therefore to the rules of law as handed down to us in respect to executors, we are obliged to pronounce that the defendant, Smith, having once received and fully had under his control assets of the testator applicable to the payment of this bond debt, was responsible for the application thereof to that purpose, and such application having been disappointed by the misconduct of his co-executor, whom he employed to make the payment in question, he is liable for the consequences of such misconduct, as much as if the misapplication had been made by any other agent of a less accredited and inferior description.” It may however be objected to that case, that it was at law, and that in equity, a different rule prevails: but this is a mistake; equity is bound as much by legal rules where they apply to the case as a Court of law. Belief may, and often is, given in *225 equity where it cannot be at iaw, owing to the difference in the modes of proceeding, and the effect of the judgments of the two Courts: at law, the judgment gives effect to a previously existing legal right: in equity, the decree creates a legal right out of a contract or trust. But it will be seen on Hooking to Lord Ellenborough’s judgment, that he founds it mainly upon cases decided in the Chancery Court, and it is ^ hence apparent that the rule is the same in both Courts.
In Sadler v. Hobbs, 2 Br. C. C. 114, the bill was filed by a residuary legatee for his legacy, and in the report on the accounts, it appeared that Davies had joined with Reeve, his co-executor, in drawing two bills of exchange, amounting together to £1000, on the house of Trueman, Reeve & Co., payable to Devonshire & Reeve, as he supposed, in satisfaction of the testator’s debt to them to that amount; but he was in this respect mistaken, the debt being only £3000, so that the executors had paid £4000 too much. Reeve, the executor, who received the money under the bills of exchange, afterwards became bankrupt. The question for the Court was, whether the joinder of Davies in the bills of exchange, without the receipt of the money, made him answerable to the plaintiff for it. Lord Chancellor Thurlow ruled that he was; and stated the rule to be, “ that where, by any act or any agreement of the one party, money gets into the hands of his companion, whether a co-trustee or co-executor, they shall be both answerable.” In a note to that case (Note 1) the editor remarks, that “ Westley v. Clarke (before Lord Northington, and lately reported in 1 Eden, 351) mentioned in the case of Sadler v. Hobbs, with some disapprobation, (whether rightly determined as to its peculiar circumstances, 4 Ves. 609,) seems to have given.occasion to relax the sound and intelligible rule which previously prevailed, viz.: that where either executors or trustees (and executors more especially) joined in any act which as to them was unnecessary, and a loss happened, the parties thus unnecessarily concurring should be held responsible, although none of the funds came into their hands: that rule seems to be now restored”— and he refers to a host of authorities in support of his assertions. Although in the words of this note, and of Lord Thurlow in the case of Sadler v. Hobbs, there is some difference from those employed by Toller, in stating the rule as I have done, yet the difference is merely verbal: the rule is identical in substance. Eor the meaning is clear throughout, that the concurrence to charge an executor for the act’ of a co-executor, must be voluntary and not the result of legal necessity. The case of Sadler v. Hobbs and that under consideration are almost identical. That case as well as this was in equity, and on a bill filed by the residuary legatee: the concurrence there, was not greater than it is here; it *was a payment to a co-executor as one of'a firm, supposing him [-*291 entitled to receive it on account of a debt, when in fact he received more than the firm was entitled to : so in this case, it was a payment .to a co-executor, supposing him entitled to receive it for his son’s legacy.
The case of Joy v. Campbell, 1 Sch. & Lef. 328, maintains the same position. At page 341, Lord Chancellor Redesdale states the rule with his accustomed fulness and clearness. “The distinction,” he says, “seems to be this with respect to a mere signing : that if a receipt be given for the mere purposes of form, then the signing will not charge the person not receiving; but if it be given under circumstances purporting that the money, though not actually received by both executors, was under the *226 control of both, such a receipt shall charge; and the true question in all those cases seems to have been whether the money was under the control of both executors: if it was so considered by the person paying the money, the joining in the receipts by the executor, who did not actually receive it, amounted to a direction to pay his executor, for it could have no other meaning; he became responsible for the application of the money just as if he had received it. Butthis does not applyto what is done in the of the discharge of a necessary duty of the executor.” This clear view rule is in exact accordance with all the previous authorities ; and carries out and enforces the explanations and application which I have given or made. Test the case before us by Lord Chancellor Redesdale’s criterion, “ whether the money was under the control of both executors,” and it will be seen that Dr. Garden’s liability is fixed beyond all doubt: he had the control of the money until he paid it over to his co-executor on a mistaken view of his power to receive it for his son, and it follows that having had the control he is liable for it. It cannot be necessary to multiply authorities to establish a rule which is now conceded by all the law and equity writers to be settled law. ' But it is said that there is a distinction in the application between a creditor plaintiff and a legatee plaintiff: as I have already said, that distinction cannot be maintained. The case of Sadler v. Hobbs, which I have already stated and commented on, shows that the application of the rule is allowed even in the case of a residuary legatee plaintiff, and the Lord Chancellor, in that case, speaking of the distinction in the reasoning of Lord Chancellor Harcourt, *2921 *n ^le case Churchill v. Hobson, 1 P. Wms. *241, calls it (as J it deserves to be called) an odd distinction. But as Chancellor Harcourt’s remark.in Churchill v. Hobson was a mere dictum and not the point ruled, it could not have created the doubt which does seem to have existed on the subject. It is referrable more probably to the case of Westleyu Clarke, before Lord Northington, 1 Eden, 351; but although it had the effect to relax the old rule, yet, as the editor observes in his note to the case of Saddler v. Hobbs, “that rule seems now to be restored.” The case of Bacon v. Bacon, 5 Ves. 331, is no authority for the distinction between creditors and legatees as to the liability of co-executors ; there the payment to the unqualified co-executor was sustained, not on account of his character as executor, but because he was the testator’s attorney, and the payment to him was in the regular course of business. I am not prepared to say that a case decided under its special circumstances, (as that case was,) is ever authority for any purpose; but it is clear, without utterly.condemning it, that it proves nothing in this case. In Doyle v. Blake, 2 Sch. & Lef. 229, the bill was by the legatees against the solvent and surviving executors who had renounced in favor of the now deceased executor, Horan, who afterwards obtained administration cum testamento annexo, received and wasted the funds and became insolvent; it was ruled that they were liable for his acts. In the case, Lord Redesdale says, “ Legatees are bound by. the terms of the will; creditors are not so; and therefore in many cases executors would be discharged as against legatees, though not as against creditors.”.
This, regarded as an abstract proposition, is a startling one; but when explained by the subject-matter of which the Lord Chancellor was speaking, is plainly right. The testator, in the case then before him, had *227 directed all the funds to be deposited with the co-executor, Horan, as trustee for the legatees. It is clear, beyond all doubt, that such a payment to him under the will would have been good against the legatees: for as between them and the other executors, Horan would have been, under the will, the agent of the legatees in the receipt of the money, and they would have been bound; but creditors would not have been, for he had no right to receive as trustee until the debts were paid. With this explanation, the case is consistent with itself and all the previous cases. For in the point ruled by the decision of the case, (as I have already stated it,) and the Lord Chancellor’s reasoning *at 242, r*ooo it is a direct authority in support of the general and old rule. L But, as was well said in the argument, the case of Langford v. Gascoyne, 11 Ves. 333, uproots the distinction supposed to exist between creditors and legatees. That was a bill by a widow claiming to be a legatee for life, and the general residuary legatees. There were three executors, Gascoyne, Lambert and Spurrell: the day after the testator’s funeral, the three executors met at his house. His widow brought out to them a bag of money, and on being advised not to trust it to Gascoyne, she delivered it to Spurrell in the presence of the other two. He counted it and handed it to Gascoyne. It was held by the Master of the Bolls, Sir William Grant, that Spurrell was liable. He says, “ The rule in all the cases is, that if an executor does any act by which money gets into the possession of another executor, the former is equally answerable with the other; not where an executor is merely passive, by not obstructing the other in Receiving it.” In the case of Monell, et al., v. Monell, 5 J. C. R. 283-8, Chancellor Kent, speaking of this subject, said, “ a rule once prevailed in England which was recognised in Pennsylvania, (1 Dallas, 311,) that either of two executors who had executed receipts for assets, was liable to the legatee for the amount only actually received by him. But that rule is exploded, and the doctrine now established at law and in equity is, that if assets come to the hands of one executor only, but both join in a receipt for them, both are equally liable to legatees and creditors.
In this State no distinction has ever been made between creditors and legatees. In Evans v. Evans, 1 Eq. Rep. 520, Chancellor Rutledge, speaking of the liability of executors for joint acts, although only one received the money, said, “ As they were all consenting and joined in the sale, they must all be responsible for the debts, but not 'one for the separate act of the other.” In Lenoir v. Winn, 4 Eq. Rep. 65, and in another case in the same book, 92, the rule is loosely stated, but most obviously in reference to it as stated by Chancellor Butledge in the case of Evans v. Evans, and in the English authorities. It is, I think, therefore clear beyond all doubt from this array of authorities, that in a suit by a legatee as well as a creditor, both at law and in equity, “that where by an act done by one executor, any part of the estate comes to the hands of his co-executor, the former will be answerable for the latter, in *the |-*oq. same manner as he would have been for a stranger whom he had L enabled to receive it.”
But it was contended that admitting this to be true, yet that the plaintiffs were not entitled to recover, because the executor has misapplied, and therefore wasted the fund, and that their intestate having received his residuary legacy, could not have been called upon by the legatee, Theodore Brailsford, to pay his legacy: and that therefore the payment, *228 by Dr. Jotmson, was altogether voluntary; and the ease of Lupton v. Lupton, 2 J. C. R. 614-627, was cited in support of this position. It does, beyond all doubt, prove that where the executor has wasted the assets, that a legatee who has been paid must refund to a creditor, but cannot be compelled to contribute to make up a legacy to a co-legatee. But the authority has no application to this case. • A part of the assets of Mary Johnson, deceased, were unadministered and in the hands of the surviving executor at the time the guardian of young Brailsford demanded payment. He was legally liable to meet the demand. For there had been no sufficient legal payment to the legatee; and having assets of the estate in his hands, equal to and beyond the amount claimed, he had no cause to allege why he should not pay the legacy and the interest due thereon. The plaintiffs could not object to the allowance of this payment in the accounts of the surviving, executor, and hence they had a right to call on the other executor, Garden, for the amount he had misapplied. It was a part of the estate of Mary Johnson, and in legal contemplation in the hands of Garden. He is, therefore, plainly accountable to the plaintiffs. Sadler v. Hobbs, 2 B. C. C. 114. The executor, Garden, being accountable for the $1000 paid by him to Robert Brailsford for his legacy, I think he must account for it with interest from the time he paid it to Brailsford. The legacy and interest was properly paid by the surviving executor. For there can be no pretence that the interest, while it was in the father’s hands, was applied to the maintenance of his son. The father made no such charge. Garden cannot make it for him. But if this hacf been contended for by the representatives of the father, it would not have been sustained. For so long as the father was of sufficient ability to maintain his child, it was his duty to do so. Myers v. Myers, 2 M’C. C. R. 264. There is no proof or assertion that there was any inability to do so. His insolvency probably developed itself after his death.
*90^1 *6- Garden’s,liability to account for the amount of the sale of 1 J the perishable articles, with the interest thereon, results from the view which I have taken of his liabilty to account for the $1000. In this respect, however, there are some additional circumstances making it still plainer. He applied for and obtained the order for sale, and returned the sale bill. Each of these acts he did as executor without even noticing any other person. They cast upon him the burthen of accounting for the proceeds of the sale. It was no answer to say that a part or the whole thereof had been received by his co-executor, unless he could also have shown that the co-executor received it against his will. This, however, is not pretended, and it follows that Garden’s liability is on the clearest principles made out.
7. I think there is no doubt that the late Dr. Garden is liable to the account for waste, both as tenant for life of the whole, and as tenant in common of the remainder in fee. This is not an application to stay waste, but for an account of whatever may have been committed. In general, it may be admitted that one tenant in common cannot have an injunction against his co-tenant. But even between them, under special circumstances, the Court might grant an injunction. As where the waste was destructive to the estate, and not within the usual and legitimate enjoyment. Hole v. Thomas, 7 Ves. 589; Twort v. Twort, 16 Ves. 128. And, as in the case of Hawley v. Clowes, 2 J. C. R. 122, where the *229 tenant in common in possession was cutting down the timber and threatening to persevere. This last case carries the proposition further than I should be willing to sanction: it ought, I think, to be shown that the cutting down the timber was not necessary to the enjoyment of the estate, and would greatly prejudice the interest of the co-tenant. But without dwelling further on a view of this part of the case not necessary to the decision of the point now in dispute, I will proceed to state the grounds upon which the defendant is liable to an account for waste.
In several cases in this State it has been held that a tenant in common may use the estate to the extent of his interest in it: and in the case of Kerr and wife, et al., v. Robertson, it was held (by my brethren) that for. woodland cut down and cultivated by one tenant in common, he was not liable to account to his co-tenant for rent, but that the remedy of the latter would be for waste. In Backler v. Farrow, ante, 111, (at the last term in Columbia,) it was held that *co-tenants who had cut down and worn out a portion of the land much beyond their shares, L J were liable in equity to account for the waste, and the Commissioner having reported a sum certain as to the value of the waste committed, the defendants were ordered to pay it. These cases sufficiently show the right of the plaintiffs to come here against the representatives of their intestate’s co-tenant for an account for the waste by him committed. It only remains to inquire what is waste ? and is it made out here ? According to the English authorities, cutting down woodland, interspersed as our forests universally are with timber trees, would be waste. But there has been some modification of this rule in this State. Several cases have been decided on the subject — two I recollect pretty well, and will, from memory, (as we have no reports of them,) state the principles by which they were decided. In Milam v. Byrd and wife, Mrs. Byrd was tenant for life of her former husband’s estate, consisting of a plantation and negroes. It was alleged that her second husband had brought his own negroes on the plantation, and with them and the negroes of his wife that he was cutting down large bodies of the woodland. He was.restrained from cutting down the land for the employment of his own negroes; but he and his wife were allowed, with her negroes, to cut down as much-land as a prudent man, the owner of the fee, would do in a course of good husbandry. It was made the subject of reference to ascertain the present or future quantity to be cleared. In Nuckoll’s v. M’kie, a large tract of land, principally in the woods, was devised to Mrs M’Kie for life, and after her death to the plaintiffs. She not only cleared a portion herself, but settled many tenants on different parts of the land. Her tenants were restrained from clearing the land, but she was permitted to cut down and cultivate the land for her own use and support
These cases leave the rule perhaps still too vague, and do not reach the case of a tenant in common. But when taken in connection with the eases fixing the right of a tenant in common to the use of the estate to the extent of his interest and his liability to account for waste committed, I think we may deduce the rule to be — that where a tenant in common, by cutting down and clearing woodland, beyond his interest, has greatly injured the interest of his co-tenant, he would be liable for waste. And so if the *tenant for life cuts down more woodland than is necessary for the enjoyment of his estate, and has injured the remainder, L he would be guilty of waste, and liable to the account. It is the ultimate *230 injury done to the rights of the plaintiffs, as co-tenants or in remainder, which gives them the right to complain. For if the clearing of the land had improved its value to the co-tenant or remainder-man, it could not be pretended that still the co-tenant, or tenant for life, would be liable for waste.
It now remains to be considered whether, according to this rule, Dr. Garden was guilty of waste. Under the clauses of the will of Thomas ÍST. Johnson, sen., deceased, already cited, he had a life estate in the land of his wife, Sarah, and according to the construction placed upon the same by the Court of Equity, he was also entitled to one-sixth in fee. There are no words in the will which would exempt him from the impeachment of waste. If it should turn out that there was no cleared land ■on the plantation when Dr. Garden went into possession, then it is probable that he did not clear more than was necessary to the enjoyment of his life interest, and did not exceed his interest as tenant in common. But, as is most probable from the testimony, there was a cleared, plantation sufficient for the employment of the slaves of his wife, in which he also had an estate/or life, then it is clear that the clearing of sixty acres of woodland in the centre of the tract, not leaving timber enough upon the whole land to repair the plantation, and which the witnesses, (Nelson and Ilavin,) say was an injury of $500, would be waste. But as it may be that the Commissioner did not ascertain the precise injury done to the remainder of five-sixths in fee by the clearing at the time the life estate fell in, the report will be left open for further examination on this point, under the rules laid down in this opinion.
8. Under the former decree, the plaintiffs are plainly entitled to the account of five-sixths of the rent of the land, and half of the hire of the negroes. For this bill, although not a bill of reviver, sets out the former decree, and with the immense mass of other matter brought to the view of the Court, claims that it should be executed. This was, I think, proper where the bill embraced new matter: if it had barely proceeded on the former decree, then that case ought to have been revived. In taking the account under the former decree, the Commissioner must observe that Hext and Mrs. Miles, the adult defendants, are alone liable *9oq-i to be ^charged therein. They were in possession of the property, ^ -J and they, not the minor, are properly chargeable.
In making up the accounts against Dr. Garden, the Commissioner will deduct, from the eventual balance against him, the amount of $470, which his estate was entitled to receive from Thomas N. Johnson, the younger, under the decree confirming the partition of the land and personal estate of his first wife, Sarah, with interest from the date of the decree of confirmation.
It is ordered and decreed that Chancellor Johnston’s decree be modified according to the views expressed in this opinion; and that the case be remanded to the Commissioner, with instructions to restate the accounts according to the principles and directions herein contained: and that the defendants may, by other and additional testimony, discharge themselves; to which the plaintiffs are permitted to reply: and where necessary under this opinion, testimony in explanation of facts of the case which are doubtful upon the former proof, may be received by the Commissioner. Let the costs be paid out of the estate of Garden.
■Johnson, J., and Harper, J., concurred.